UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,

v.

RANDALL W. DELLINGER,

                    Defendant.

_____/

Case No.  13-cr-20808

HON. MARK A. GOLDSMITH
United States District Judge

**OPINION AND ORDER GRANTING THE GOVERNMENT'S REQUEST TO
INVOLUNTARILY ADMINISTER MEDICATION TO DEFENDANT TO RESTORE
HIM TO COMPETENCY TO STAND TRIAL (Dkt. 9)**

**I.  INTRODUCTION AND BACKGROUND**

Defendant Randall W. Dellinger is charged with interstate communication of a threat, in violation of 18 U.S.C. § 875(c).  Indictment (Dkt. 1).  On December 3, 2013, this Court ordered, pursuant to 18 U.S.C. § 4241(d), that the Attorney General hospitalize Defendant for examination and treatment of his mental disease or defect, which renders him incompetent to stand trial.  See 12/3/13 Order (Dkt. 5).  The Court received two reports from the Bureau of Prison's medical staff regarding Defendant's progress, one from Dr. Christina Pietz, Ph.D., ABPP, and another from Dr. Robert Sarrazin, M.D.  According to the reports, Defendant has refused medication necessary to achieve restoration of competency.  Therefore, the Court held a hearing pursuant to Sell v. United States, 539 U.S. 166 (2003), to determine whether Defendant should be involuntarily medicated.

Defendant and the Government's witnesses, Drs. Pietz and Sarrazin, participated in the hearing via video conferencing from the U.S. Medical Center for Federal Prisoners in

Springfield, Missouri.[1]  The record evidence at the hearing also included the written reports of each doctor, which had been previously submitted to the Court.  Drs. Pietz and Sarrazin opined that Defendant suffers from schizophrenia and remains incompetent to stand trial.

Dr. Pietz testified that Defendant's symptoms include irrational, delusional thinking, as well as having episodes of paranoia.  Dr. Pietz further advised that, although Defendant is participating in group therapy, Defendant does not believe that he has a mental illness and has refused other treatment, including medication.  In her opinion, antipsychotic medication is essential for treating Defendant and, if medicated, there is a substantial likelihood that Defendant can be restored to competency.  She further opined that antipsychotic medication would improve Defendant's thinking and his ability to rationally understand his current legal situation and assist counsel in his defense.

Dr. Sarrazin similarly stated that the appropriate treatment for Defendant's psychotic illness is antipsychotic medication; alternative treatment, including psychotherapy, could not restore Defendant to competency without medication.  He testified that treatment with medication would improve Defendant's ability to communicate and work with others.

In his report, Dr. Sarrazin further opined: "The effectiveness of antipsychotic medication in treating schizophrenia and related psychotic disorders has been repeatedly demonstrated in published professional literature for nearly 50 years, and is considered an essential element in the treatment of these conditions."  His report outlines the relevant data on restoration of competency in situations similar to Defendant.  Citing several published studies, Dr. Sarrazin wrote that "the available empirical data indicates that the majority of incompetent defendants suffering from schizophrenia and related psychotic disorders who refused the recommended

---

[1] Defendant did not introduce any evidence or witness at the hearing.

treatment with antipsychotic medication can be restored to competency to stand trial following a period of involuntary treatment." Therefore, Dr. Sarrazin concluded that "involuntary treatment of Mr. Dellinger with antipsychotic medication will substantially likely render him competent to stand trial and [is] substantially unlikely to have side effects that will interfere significantly with his ability to assist counsel in conducting a defense."

Dr. Sarrazin also testified that a detailed proposed treatment plan was outlined in his report dated February 4, 2014. He summarized the plan by stating that Defendant initially would be administered antipsychotic medication at the low end of the dosage range, with the amount gradually increased to achieve clinical improvement with the lowest effective dosage. He also detailed in his report the potential side effects of antipsychotic medication, indicating that the majority can be categorized as "common and troublesome rather than rare and dangerous." He testified that there are doctors, nurses, social workers, and correctional officers available around the clock to monitor Defendant's response to the prescribed medication and to minimize any potential adverse side effects to Defendant from the prescribed medication. Dr. Sarrazin's testimony and report also indicated that Defendant's other medical conditions were considered when preparing the treatment plan.

Both doctors further opined that if Defendant cooperated with the proposed treatment plan, there is a substantial likelihood that he would be restored to competency within a period of approximately four to six months.

## II. ANALYSIS

The central issue before the Court is whether Defendant should be involuntarily medicated in an effort to render him competent to stand trial. Although Defendant generally has a constitutional right to refuse medical treatment, the Supreme Court has outlined a four-part test

to determine whether a defendant can be involuntarily medicated to render him or her competent to stand trial: (1) whether there is an important governmental interest in the prosecution; (2) whether involuntary medication will significantly further the government interest, i.e., whether involuntary medication is substantially likely to render the defendant competent to stand trial and substantially unlikely to cause side effects that will interfere significantly with the defendant's ability to assist counsel in conducting the trial defense; (3) whether involuntary medication is necessary to further the governmental interest, and less intrusive treatments are unlikely to achieve substantially the same results; and, (4) whether administration of antipsychotic drugs is medically appropriate for the individual defendant. Sell, 539 U.S. at 179-181; United States v. Grigsby, 712 F.3d 964, 969 (6th Cir. 2013); United States v. Green, 532 F. 3d 538, 544-545 (6th Cir. 2008). The Government must prove its case for involuntary medication by clear and convincing evidence. United States v. Payne, 539 F.3d 505, 508-09 (6th Cir. 2008). The Court considers the factors in turn.

A.      **Government Interest**

Although Defendant stipulated and agreed at the hearing that the first Sell factor — that there is an important governmental interest in the prosecution — had been met, he argued in a supplemental brief that this was only a stipulation that the Government has a strong interest in prosecution given the nature of the crime. Def. Supp. Br. at 2 (Dkt. 17).[2] Defendant now claims that the importance of the Government's interest is lessened because (1) he may face a lengthy civil commitment due to his mental illness, and (2) the length of confinement while the Government attempts to restore competency and prosecute him approximates the length of any

---

[2] Although Defendant originally stipulated that the first Sell factor was satisfied, the Court ordered supplemental briefing on whether the Government's interest was diminished under the Sixth Circuit's decision in Grigsby. See 4/2/14 Order (Dkt. 13). Defendant raised these arguments for the first time in his supplemental brief in response to the Court's order.

sentence of imprisonment he ultimately may receive if convicted.  Id. at 7.

With respect to the expectancy of civil commitment, Defendant argues that, while the initial examination for involuntary medication determined that he "is not a danger to self or others," this opinion was based on the short time frame that he had been at the facility, and appears not to have considered his past criminal history and alleged behavior in this case.  Id. at 2-3.  Defendant also notes that, during his time at the facility in Springfield, Missouri, he was placed in a locked unit "for the safety of staff and for the safety of the other patients living in the facility" due to an incident involving an officer.  Id. at 3.

The Government argues that whether Defendant would be subject to civil commitment is uncertain.  Gov't Supp. Br. at 3-4 (Dkt. 16).  The Government claims that Defendant has not been evaluated for civil commitment pursuant to 18 U.S.C. § 4246, and that "[c]ivil commitment involves a type of risk assessment that is completely different than the assessment of competency and the need for involuntary medication."  Id. at 3-4.  The Court agrees.

Under both federal and state law, civil commitment requires clear and convincing evidence that Defendant "is so disabled that he is a serious danger to himself or others."  United States v. Mikulich, 732 F.3d 692, 699 (6th Cir. 2013) (citing 18 U.S.C. § 4246(a) and Mich. Comp. Laws § 330.1401(1)(a)-(d)).  Defendant has not yet been evaluated for civil commitment, and there is no expert testimony or evidence in the record regarding whether he would be likely to be civilly committed if he was not involuntarily medicated.  The initial assessment for involuntary medication concluded that Defendant was not a risk to himself or others, albeit within the confines of the facility.  On the other hand, there was one incident in or around February 2014 requiring Defendant to be placed in a locked unit, although Dr. Pitez testified that Defendant has been doing "very well" since that incident and is now in a semi-structured unit

5

where he "cooperates with staff," "has not been agitated in any way," has "followed institution rules," and has avoided any further incidents.  3/5/14 Hr'g Tr. at 8-9 (Dkt. 7).   Moreover, it appears from the record that this incident did not involve any violent behavior in the nature of actual threats or assault.  See id. at 9, 13 (noting that the officer reported that Defendant accused him of stealing some property and harassing him, and that Dr. Pietz responded by moving Defendant to a locked unit for the safety of staff and other patients because Defendant became "agitated"), 19-20 (stating that Defendant did not assault or verbally threaten the officer, although his behavior suggested a "perceived threat").

Defendant's past history also puts into question whether he would qualify for civil commitment.  On the one hand, while the allegations in this case concern threatening telephone calls, there is no indication in the limited record before the Court that Defendant intended, or took any actions, to carry out the threats.  On the other hand, according to the Government, Defendant has been convicted of at least two crimes in the last thirteen years (resisting and obstructing (2001) and possession of an explosive with unlawful intent (2006)), was re-arrested approximately six months after his arrest in this case — while on bond — for felonious assault for allegedly striking his daughter (no prosecution to date), and he purportedly made additional threatening calls to his pretrial services officer.  Gov't Supp. Mem. at 6-7.  However, neither party has provided specific details about the facts and circumstances surrounding these acts and convictions, nor is there testimony or evidence regarding whether these incidents (or the incident at issue in this litigation) arose out of Defendant's mental illness.  Indeed, Defendant purportedly has not notified the Government of an intent to raise an insanity defense at trial, nor does he mention an intent to do so in his supplemental brief.  See Gov't Supp. Mem. at 8-9; Def. Supp. Mem. (Dkt. 17).

6

Simply put, the record leaves the Court uncertain whether Defendant would qualify for civil commitment under either federal or state law; and uncertainty is insufficient to undermine the Government's interest in prosecution. See Mikulich, 732 F.3d at 699 ("As stated in Grigsby, a defendant is not required to manifest an absolute certainty of future civil commitment in order to undermine the Governments [sic] interest in prosecution. However, this does not mean that uncertainty will carry the day. Quite to the contrary, our sister circuits have held that the government's interest in prosecution is not diminished if the likelihood of civil commitment is uncertain." (internal quotation marks and citations omitted) (emphasis in original)). That is not to say that this showing had to be made with absolute certainty; but here the record leaves civil commitment an entirely uncertain outcome.[3] Indeed, even Defendant concedes that "[t]he specific question as to whether or not Mr. Dellinger would face a lengthy civil commitment has not been addressed," and that, as the Government points out, "it is uncertain whether Mr. Dellinger would be subject to civil commitment if he is not restored to competency." Def. Mem. at 3-4. The Court thus concludes that, based on the record before it, this factor does not lessen the importance of the Government's interest in prosecution. Cf. Grigsby, 712 F.3d at 970-972 (holding that likelihood of civil confinement did lessen the Government's interest in light of the "significant evidence . . . presented at the Sell hearing that [the defendant] may face a lengthy civil commitment due to his mental illness," including a doctor's opinion that the defendant "may not be fit for return to society").

---

[3] Defendant argues that requiring him to introduce evidence showing a likelihood of civil commitment "inappropriately shifts the burden" to him. Def. Supp. Br. at 3-4. However, the Sixth Circuit has clearly stated that, "[w]hile the ultimate burden of proving an important interest in prosecution always remains with the Government, we look to the defendant to demonstrate that the special circumstances of his case undermine the Government's interest once it is established that he stands accused of a serious crime." Mikulich, 732 F.3d at 698-699. As such, requiring Defendant to show that special circumstances undermine the Government's interest does not inappropriately shift the burden to him.

7

Defendant also claims that the Government's interest is diminished in light of the length of time it will take for him to be restored to competency and prosecuted, compared to the length of any sentence he may ultimately receive if convicted. Def. Supp. Br. 4-7. The Government has calculated that, assuming Defendant pled guilty and received a three-point reduction for acceptance of responsibility, his estimated guideline range would be 30-37 months imprisonment. If Defendant were to go to trial and be found guilty, the Government estimates his anticipated guideline range as 41-51 months. Gov't Supp. Mem. at 11. According to the Government, the maximum statutory sentence of imprisonment is five years. Id. at 10. Defendant does not dispute these calculations.

The first complaint in this case was filed on June 28, 2012. See United States v. Dellinger, Case No. 12-20542. Defendant was arrested and detained that same day. Id. He was released on bond on August 1, 2012, but was detained again in January 2013 following the incident involving his daughter and the calls to his pretrial services officer. After a nearly three-month delay in transporting Defendant for mental health treatment, the Court dismissed the case without prejudice on October 18, 2013 pursuant to the Speedy Trial Act, 18 U.S.C. § 3162(a)(2), and dissolved the stay of that decision on November 7, 2013. Id. (Dkts. 38, 39). A new indictment in the instant case based on the same conduct was returned at that time. United States v. Dellinger, Case No. 13-20808.

The Government estimates that — including four months for competency restoration, two to get to trial, and three months to sentencing — Defendant will have spent approximately 26 months in custody as a result of the offense. Gov't Supp. Mem. at 12. The Government thus claims that its interest is not diminished because the length of pretrial detention is less than the anticipated sentence. Id. Defendant responds that the 26-month estimate is too uncertain

8

because it could take longer to restore him to competency and because it may take more than two months to bring him to trial. Def. Supp. Mem. at 5-6. Defendant also highlights that the Government fails to mention that some of the delay is the result of a failure to transport him to receive treatment. Id.

The Court concludes that the estimated length of Defendant's detention does not diminish the Government's interest in prosecution to the point that involuntary medication is inappropriate. Assuming the Government's calculation of the estimated advisory guideline range is correct, see Grigsby, 712 F.3d at 973 (utilizing Government's calculation of likely guideline range), Defendant faces a likely guideline range of 41-51 months imprisonment if convicted at trial, and 30-37 months imprisonment if he were to plead guilty. The Government estimates that, as of April 24, 2014, Defendant would receive 17-months' credit toward his sentence, and Defendant does not dispute this calculation. Drs. Pietz and Sarrazin have estimated that it will likely take somewhere between four to six months — depending on Defendant's willingness to take the medication — to restore Defendant to competency. Hr'g Tr. at 10-11, 45. Assuming two additional months for a plea agreement, and three more to sentencing, Defendant could still be facing nearly a year of imprisonment under the guidelines if he pled guilty, plus any additional supervised release. And if Defendant decided to proceed to trial, thereby requiring an additional two months, the Government's interest would not be diminished in light of the higher estimated guideline range.

In addition, although not determinative, the Court is also cognizant of the fact that while some of this delay is the result of the failure to properly transport Defendant to obtain care, a number of months also result from Defendant's refusal to take medication. Although the Court is sympathetic to the fact that this may arise out of Defendant's mental illness itself, it is also

unfair to punish the Government for the delay during this period.  See United States v. Horton, 941 F. Supp. 2d 843, 854 n. 17 (N.D. Ohio 2013) ("The Court notes that part of the delay to date is the result of defendant's unwillingness to cooperate in the evaluation process, and the lengthy period of time his expert took in evaluating defendant.  While defendant's obstructive attitude is likely a product of his mental illness, it is unfair to assess the entire amount of the delay to the government or the Court.").

Lastly, aside from the possible term of imprisonment, other interests and punishments are relevant to the Court's analysis.  For example, the Government claims that a period of supervised release and other restrictions may be imposed if Defendant is convicted.  Other courts have considered this factor in deciding that the Government retained an interest in prosecution, and the Court concludes such a consideration is proper in this case as well.  See, e.g., United States v. Gutierrez, 704 F.3d 442, 451 (5th Cir. 2013); United States v. Bush, 585 F.3d 806, 815 (4th Cir. 2009).  Moreover, the prosecution of this serious offense — threatening a United States Senator — sends a message of "society's disapproval" of such conduct, and is likely to deter others from similar behavior.  See Horton, 941 F. Supp. 2d at 855.  Therefore, even if the length of pre-trial detention diminishes the Government's interest somewhat, the Court concludes that the Government still has a strong interest in prosecuting Defendant.  Id. at 854-855 ("While this consideration does serve to diminish the importance of the governmental interest, the Court finds that the government retains a strong interest in prosecuting defendant and has, therefore, proven the first Sell factor by clear and convincing evidence.").

**B.    Remaining Factors**

Defendant also disputes whether the remaining Sell factors have been satisfied.  He claims that involuntary medication is inappropriate because (1) there are potential risks

associated with the medication; (2) the doctors did not properly consider Defendant's other medical conditions; and (3) it is not certain that involuntary medication will be successful. Def. Supp. Mem. at 11-12 (Dkt. 11).

The Court finds, however, that the Government met its burden through the testimony and reports of Drs. Pietz and Sarrazin, both of whom opine that antipsychotic medication is necessary to further the governmental interest, and that there are no other less intrusive treatments available that would achieve the same results. Both doctors testified that therapy, without medication, would not be effective, and that there is little risk of serious side effects arising out of the administration of the antipsychotic medications. Hr'g Tr. at 11, 34-36, 44-47, 54-56, 58. Both doctors also testified that antipsychotic medication is substantially likely to restore Defendant to competency to stand trial, and to allow him to assist counsel with his defense. Hr'g Tr. at 10 ("In my opinion, if properly medicated, there's a substantial likelihood that he could be restored to competency."), 44-45 ("It is also my opinion that with treatment with antipsychotic medication, that it is substantially likely that Mr. Dellinger will be restored to competency so that he can proceed in his trial."). Indeed, Dr. Pietz specifically testified that medication would "impact [Defendant's] ability to assist his attorney in a positive way," because "[h]e will be better able to communicate with his attorney, better able to provide his attorney with pertinent information," and better able to help prepare a rational defense. Hr'g Tr. at 13, 37.

To the extent Defendant suggests that the particular probabilities of restoration mentioned in Dr. Sarrazin's report are insufficient, the Court rejects this argument. Dr. Sarrazin's report indicated that studies showed varying degrees of success with involuntary medication, ranging from 75% to 87%, including a 2012 survey showing a 79% competency restoration rate for defendants suffering from a psychotic-related illness who were involuntarily treated under Sell.

11

As the Sixth Circuit has explained, "[t]he standard is not certainty, but rather substantial probability." Payne, 539 F.3d at 509-510.  Like the evidence in Payne, the uncontroverted expert testimony in this case revealed "that the proposed treatment plan was substantially likely to restore competency without unmanageable side effects." Id. at 510; Hr'g Tr. at 10, 44-45, 47-48.  Indeed, Dr. Sarrazin opined that Defendant's treatment response would be similar to those found in the studies.  And Defendant concedes that the studies generally revealed that "the majority (79%) of treated defendants suffering from a psychotic related illness were sufficiently improved to be rendered competent to stand trial."  Def. Supp. Br. at 11 (Dkt. 11).  The Court finds this sufficient.  See Green, 532 F.3d at 553 (citing case that found that a 70% chance of restoration to competency satisfies "substantial likelihood" test); Horton, 941 F. Supp. 2d at 857 (collecting cases holding the same).

With respect to possible side effects, Dr. Sarrazin expressly considered Defendant's particular medical conditions and medications in his report, but stated that "[t]here is no concern for potential drug/drug interactions with Mr. Dellinger's current medications and antipsychotic medications that are being proposed."  Dr. Sarrazin's report goes on to note that the treatment plan would be screened by a licensed pharmacist before any medications were started.

Dr. Sarrazin also made clear that there are substantial monitoring systems and treatment regiments in place to minimize the risk of any adverse reactions; for example, the doctors begin with low medication dosages and slowly increase them, while carefully monitoring Defendant — around the clock — for any adverse reactions.  Hr'g Tr. at 46-47, 57-58.  Lastly, while noting that side effects were possible, Dr. Sarrazin explained that the majority can be characterized as "common and troublesome rather than rare and dangerous," and that the medication is "substantially unlikely to have side effects that will interfere significantly with [Defendant's]

ability to assist counsel in conducting a defense."

The report also notes that the likelihood of Defendant contracting an irreversible disorder — such as tardive dyskinesia — from the medication is exceptionally small; indeed, the report claims that the data "suggests Mr. Dellinger would be unlikely to experience any of the tardive syndromes if he were treated for an entire year with either a first generation or a second generation antipsychotic medication." The same holds true for neuroleptic malignant syndrome (.07% to 2% depending on criteria used to identify cases) or sudden death ("extremely low"; 10 to 15 events per 10,000 person years). See Horton, 941 F. Supp. 2d at 858-859 (discussing these same statistics and ultimately concluding that the Government had established that the use of drugs was substantially unlikely to have side effects that would interfere significantly with the defendant's health or ability to assist counsel). This is a far cry from Defendant's assertion that "it is apparent that a cursory review of these serious and potentially life-threatening disorders has been undertaken with tunnel vision." Def. Supp. Mem. at 12.

Drs. Pietz and Sarrazin also explained that medication is necessary for Defendant to be restored to competency; alternative treatments alone would not work. For example, while Dr. Sarrazin testified that therapy is a "valuable tool[] that can be used," its "prime purpose is to help compliance." Hr'g Tr. at 54. Dr. Sarrazin explained that "medications is the foundation that are necessary because this illness is a brain illness," id. at 55, and he opined that Defendant could not be restored to competency without medication, id. at 54-55. Indeed, Dr. Sarrazin referred to medication as the "standard treatment" that is "necessary to begin with to treat [Defendant's] illness." See id. at 44; see also id. ("He clearly needs medications in order to treat his illness. It is medically appropriate to treat schizophrenia with antipsychotic medications."). Similarly, Dr. Pietz testified that therapy, as opposed to medication, is "just not a form of treatment that you

13

would use for this particular illness." Id. at 34.  She concluded that Defendant "will not be restored to competency without medication." Id. at 11.

Finally, Drs. Pietz and Sarrazin based their reports and testimony on their meetings and interactions with Defendant, as well as their experience and medical literature.  They both testified that involuntary medication is necessary for someone with Defendant's condition — paranoid schizophrenia — and that involuntary medication is likely to restore Defendant to competency to stand trial.  Hr'g Tr. at 8, 24, 44.  Dr. Sarrazin also considered Defendant's medical conditions, as well as his past history, when putting together a detailed and tailored treatment plan, which includes consistent monitoring.  Drs. Pietz and Sarrazin also explained that medication would allow Defendant to communicate more effectively, think clearly, and lessen delusions and problems arising from those delusions.  Id. at 11-12, 48-49.  As such, their evaluations and testimony were sufficient to show that "administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medication condition." Sell, 539 U.S. at 181 (emphasis in original); see also Hr'g Tr. at 11 (stating that administering medication to Defendant would be in his best interest, and explaining the bases for this decision), 48 (same).

The Court thus finds under the clear-and-convincing standard that the involuntary administration of antipsychotic drugs — via the treatment plan outlined in Dr. Sarrazin's report — is appropriate to restore Defendant to competency for trial.   The record reflects that (1) the Government has a significant interest in prosecution; (2) involuntary medication will significantly further that interest, because it is substantially likely to render Defendant competent to stand trial and substantially unlikely to cause side effects that will interfere significantly with Defendant's ability to assist counsel with his defense; (3) involuntary medication is necessary to

14

further the governmental interest because less intrusive treatments are unlikely to achieve substantially the same results; and (4) the administration of antipsychotic drugs is medically appropriate for Defendant.

### III. CONCLUSION

Accordingly, **IT IS ORDERED** that the Government's request to involuntarily medicate Defendant to render him competent to stand trial is granted.  **IT IS FURTHER ORDERED** that, pursuant to 18 U.S.C. § 4241(d)(2), Defendant's custodial hospitalization for treatment of his mental health condition shall be extended to October 1, 2014.  During this custodial period, medication shall be administered to Defendant in accordance with the treatment plan outlined by Dr. Sarrazin in his report dated February 4, 2014.  The Court also authorizes Dr. Pietz, Dr. Sarrazin, or any other medical providers working under their supervision to perform physical and laboratory assessments and monitoring that are clinically indicated to monitor for medication side effects, provided such assessments and monitoring do not raise the risk of significant side effects that would interfere with Defendant's ability to assist counsel with his defense.

However, as discussed at the March 5, 2014 hearing, **IT IS FURTHER ORDERED** that the Government shall provide the Court and Defendant's counsel with a summary letter or report on Defendant's progress and any side effects from the medication every 45 days from the start of the medication's administration.

Defendant is ordered to comply with the directions of Dr. Pietz, Dr. Sarrazin, or any other medical providers working under their supervision, regarding the oral administration of antipsychotic medications and monitoring for side effects, as outlined in the treatment plan contained in Dr. Sarrazin's February 4, 2014 report.  If Defendant does not comply with this Court's Order, he shall be involuntarily medicated in the manner described in the treatment plan

15

contained in Dr. Sarrazin's February 4, 2014 report.  Moreover, in line with <u>Payne</u>, the Court orders the following restrictions on involuntary medication: (1) medical staff must request that Defendant take the medication orally before any forced injection is given, and must explain the potential side effects to Defendant; (2) medical staff must closely monitor Defendant's health, with the understanding that treatment is to be stopped immediately in the face of any major side effects or other problems (i.e., issues that could cause irreversible or significant harm); and (3) to the extent any major issues or side effects begin to arise, a report must be made to the Court, the Government, and Defendant's counsel within five days.

Lastly, pursuant to the Court's order dated March 24, 2014 (Dkt. 12), as soon as Defendant is restored to competency, the Government shall file a report setting forth the results of the treatment and recommendations for further medical treatment and monitoring during future proceedings in this case.  To the extent restoration occurs before the competency/status conference currently scheduled for October 7, 2014, the Court will accelerate that hearing date and schedule a new competency hearing date.

SO ORDERED.

Dated:  June 10, 2014                          s/Mark A. Goldsmith
       Flint, Michigan                          MARK A. GOLDSMITH
                                                  United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 10, 2014.

                                                 s/Deborah J. Goltz
                                               DEBORAH J. GOLTZ
                                               Case Manager